## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**AUDRA M. HUENEFELD**                 :    Case No. <u>1:08-cv-844</u>
1695 Wilderness Ridge Road             :
Milford, OH 45150                      :    (Judge _____ )
                                       :
       PLAINTIFF             :    Judge S. Arthur Spiegel
                                       :
   v.                               :
                                       :
**SHELTER CONCEPTS MANAGEMENT**        :
**CORP.**                              :
200 Galleria Pkwy SE, Suite 890        :
Atlanta, GA 30339                      :    **COMPLAINT WITH JURY**
                                       :    **DEMAND**
**SERVE: Robert G. Westlake**          :
       200 Galleria Pkwy SE, Suite 890  :
       Atlanta, GA 30339  :
                                       :
**ROBERT G. WESTLAKE**                 :
4890 Northside Dr. NW                  :
Atlanta, GA 30327                      :
                                       :
                                       :
       DEFENDANTS            :

For her Complaint against Shelter Concepts Management Corp. and Robert G. Westlake,

Plaintiff Audra M. Huenefeld states as follows:

### PARTIES AND JURISDICTION

1.     Audra M. Huenefeld is an individual residing in Milford, Ohio. At all times

relevant, she was an employee of Defendant Shelter Concepts Management Corp. ("Shelter

Concepts") as that term is defined in 42 U.S.C. § 2000e and Ohio Rev. Code § 4112.01.

2.     Defendant Shelter Concepts is a Georgia Corporation with its primary place of

business in Atlanta, Georgia. Defendant does business in the Southern District of Ohio. Shelter

Concepts is an employer within the meaning of 42 U.S.C. § 2000e and Ohio Rev. Code § 4112.01.

3.     Defendant Robert G. Westlake is an individual residing in Atlanta, Georgia. He was also Huenefeld's employer as that term is defined in Ohio Rev. Code § 4112.01.

4.     This Court has jurisdiction over Count I pursuant to 28 U.S.C. § 1331, because Huenefeld's claim is based on federal law, 42 U.S.C. § 2000e, *et seq.*

5.     This Court has supplemental jurisdiction over Counts II, III, IV, and V pursuant to 28 U.S.C. § 1367, because the state claims are so related to the federal claim in Count I that they form part of the same case or controversy.

6.     Venue is appropriate in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b), because a substantial amount of the conduct giving rise to Huenefeld's claims occurred within the Southern District of Ohio.

7.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on July 22, 2008. Plaintiff received a Notice of Rights letter from the EEOC on November 25, 2008.

## **FACTUAL ALLEGATIONS**

8.     Shelter Concepts manages rental property, including Arrowhead Apartments ("Arrowhead") in Loveland, Ohio and West Hills Apartments in Cincinnati, Ohio. Huenefeld began working for Shelter Concepts in 1987 as a rental agent at Arrowhead. At the time of her resignation, Huenefeld was the manager of Arrowhead.

9.     Westlake is the President of Shelter Concepts and was the direct superior of Huenefeld. Westlake also has an ownership interest in Arrowhead and West Hills.

10.     In 2002, Huenefeld and Westlake began a sexual relationship. Huenefeld terminated this relationship in April 2005, but continued to work as the manager of Arrowhead.

11.     From the end of their relationship until Huenefeld's resignation, Westlake repeatedly harassed her about ending their relationship and begged her to resume it. Huenefeld rejected all of Westlake's advances and asked him to stop harassing her on numerous occasions.

12.     On May 18, 2005, Westlake hired a private investigator to follow Huenefeld and her boyfriend, Brent Spelder. Huenefeld and Spelder met at DeSha's restaurant for a late lunch, and the next day, Westlake confronted Huenefeld about having a meal with Spelder. Westlake admitted that he had hired someone to follow them and said that he would do whatever it takes to know what she is doing.

13.     In August 2005, Huenefeld and Spelder met for a drink after work at Sleepy Hollow restaurant. Days later, Westlake again confronted Huenefeld about meeting with Spelder, and told her that he had a video recording of her conversation with Spelder. Westlake called Huenefeld white trash and demanded to know if she was sleeping with Spelder.

14.     In June 2006, Huenefeld took a trip to Mexico with Spelder. When she returned from her trip, Westlake told her that he wanted to be with her and that he wished that he had been on the trip with her instead of Spelder. Huenefeld again told him that she was not interested in a romantic relationship with him. In response, Westlake wrote Huenefeld an email

stating, "I don't think that I will be able to work with you anymore........let's see how we can make a transition......I give up!!!"

15.    In July 2006, while on a trip to Cincinnati, Westlake went to Huenefeld's home while she was having dinner with Spelder. Westlake snuck into Huenefeld's back yard and stole Spelder's cell phone, which was on a table on the deck. Westlake then called Huenefeld's residence and hung up. Spelder called his own phone and asked Westlake what he was doing. Westlake threw Spelder's phone into a bush in front of Huenefeld's home, damaging the phone. Westlake later apologized for his actions and instructed Huenefeld to replace Spelder's phone. Shelter Concepts reimbursed Huenefeld for the replacement phone.

16.    On February 26, 2007, Huenefeld traveled to Atlanta for business and to visit a close friend and former co-worker at Shelter Concepts, Rosemary, who was dying of cancer. That evening Huenefeld went to dinner with Westlake, and during their meal Westlake began to talk about their former romantic relationship. Huenefeld repeatedly asked Westlake to stop talking about it and made it clear that she had no interest in resuming that relationship. Westlake persisted, so Huenefeld got up from the table and left the restaurant. Westlake followed her out of the restaurant and Huenefeld asked him to take her back to her hotel. When they arrived at the hotel, Westlake passed the main entrance and parked in the rear of the parking lot. When Huenefeld asked him what he was doing, Westlake demanded that she invite him up to her room. Huenefeld refused and ordered Westlake to take her to the front of the hotel. Westlake then sped out of the parking lot onto the street, telling Huenefeld that he was taking her to his house. Huenefeld repeatedly begged Westlake to let her out of the vehicle, but he ignored her. Finally, Westlake abruptly stopped in the middle of a bridge and told her to get out of the vehicle. Huenefeld had no idea where she was, so she hysterically called Spelder for help. Spelder called

Huenefeld's hotel and asked them to send a driver to get her. After 45 minutes, a driver from the hotel found Huenefeld and took her back to the hotel.

17.     The next day, Westlake picked Huenefeld up at her hotel for a work-related breakfast meeting. Instead of discussing business, Westlake again tried to discuss their former relationship. She told him again that she had no interest in a romantic relationship, but that she loved her job and hoped they could remain civil. That evening during dinner, Westlake again brought up their relationship, and she again rejected his advances. While Westlake was driving Huenefeld back to her hotel, he told her that he needed to get rid of her. Because Westlake would not stop harassing her about their romantic relationship, Huenefeld cut her trip short and returned to Cincinnati the next day.

18.     Rosemary died three days later, but Huenefeld was unable to attend the memorial service because of Westlake's repeated harassment.

19.     On April 24, 2007, during a work-related telephone conversation, Westlake again harassed Huenefeld about their former romantic relationship. Huenefeld told Westlake that his repeated attempts to discuss their former relationship were upsetting her. Westlake responded that he would stop upsetting her if she would go to bed with him.

20.     On November 12, 2007, Huenefeld told Westlake that his repeated harassment was severely burdening her emotionally. Westlake acknowledged that he needed to stop.

21.     On Thursday, January 31, 2008, Westlake was in Cincinnati for a meeting with a landscape designer to discuss landscaping plans for Arrowhead. After the meeting, he and Huenefeld drove back to Arrowhead. When they arrived, Westlake opened a Time Magazine to

- 5 -

an article about relationships and asked Audra to answer a questionnaire on their relationship. Huenefeld refused to answer the questions and got out of the car. As Huenefeld was walking away, Westlake again told her that he needed to get rid of her.

22.     The next day, February 1, 2008, Westlake had planned to take the entire staff of Arrowhead and West Hills to dinner. Westlake called Huenefeld at approximately 10:30 a.m., and Huenefeld asked him if he still wanted to take the staff to dinner. Westlake responded that he did not want to see her, speak to her, or be around her. He then stated that their problems have been going on for two years and that he needed to resolve it. "We need to find other jobs. I'm going to take care of this situation. I promise you. I'm committed to do something about this. I will do whatever it takes. I've got to get rid of this. This is killing me, my being upset." Five minutes later, Westlake called Huenefeld again and told her that he was sorry and that he still wanted to take the staff to dinner.

23.     On Saturday, February 2, 2008, Spelder picked Huenefeld up at her home to take her to dinner. Westlake surreptitiously parked his car down the street from Huenefeld's house and followed her and Spelder to the restaurant. After Huenefeld and Spelder put their names on the waiting list, they took a seat at the bar to have a drink while they waited for a table. Approximately ten minutes later, Westlake walked into the restaurant and approached Huenefeld and Spelder at the bar. Westlake put a hand on each of their chairs and leaned into Huenefeld and said, "You have a problem and I have a problem with you." Westlake then turned around a walked out of the restaurant. Huenefeld became very nervous and sick to her stomach. Huenefeld and Spelder were seated at a table shortly after, but did not stay for dinner because Huenefeld was sick and trembling from the encounter. Huenefeld and Spelder were afraid to

return to Huenefeld's home, so they went to Huenefeld's sister's home, where they stayed until 1:00 a.m.

24.     On Sunday, February 3, 2008, Westlake arrived at the Arrowhead office while Crystal Laurie, a temporary employee, was the only employee in the office. Westlake asked Laurie to role play and pretend as if she was renting him an apartment. Laurie was very uncomfortable with the way Westlake was speaking to her, so she called Cindy Schlie, Arrowhead's assistant manager and Huenefeld's sister. Schlie called Westlake to tell him that he needed to leave because he was making Laurie uncomfortable and it was past time to close the office. She also told Westlake that she knew what he did the night before to Huenefeld at the restaurant, and that she was tired of him hurting Huenefeld.

25.     On Monday, February 4, 2008, Westlake arrived at the Arrowhead office at approximately 10:15 a.m. and demanded to speak to Huenefeld, Schlie, and Laurie. Westlake was very upset about the comments Schlie had made to him the night before. He told Schlie that the things she said to him were not true. Westlake then said, "I'm not going to fire you so you can collect unemployment. You will get two weeks without pay and I'm reducing your pay." Schlie became very upset and said, "Well, I'm not doing that." Westlake responded, "So do you quit?" Schlie said yes and left. After Schlie was gone, Westlake said to Huenefeld, "No one will ever talk to me the way she did on the phone yesterday." He then said, "Now do you want to quit?" Huenefeld said no. She then told Westlake that he had no right to follow her and Spelder to a restaurant and threaten her. Westlake responded, "I'll do whatever it takes to find out what is going on—whatever it takes. You underestimate me." Westlake then asked Huenefeld if she wanted to go to a restaurant for lunch. Huenefeld refused.

26.     Westlake left Arrowhead and traveled to West Hills to speak with Jeanne Rottenberg, the manager of West Hills. He confessed to Rottenberg that he had staked out Huenefeld's home, followed Huenefeld and Spelder to the restaurant, and confronted them at the restaurant's bar. He also told Rottenberg that he was in love with Huenefeld.

27.     On Tuesday, February 5, 2008, Huenefeld had a panic attack during her drive to work in the morning. She was almost hit by an oncoming ambulance and had to pull off to the side of the road to regain her composure. She returned home and took a sick day from work. She continued to have emotional problems and worked only intermittently for the remainder of the week.

28.     During a visit to her family physician, Dr. Thomas Lundberg, Huenefeld was told that the stress she was enduring at Shelter Concepts was having adverse effects on her health and that she needed to leave her job.

29.     On Wednesday, February 6, 2008, Westlake called Huenefeld and again began to talk about their former romantic relationship. Westlake stated, "I'm really embarrassed about some of the things I do. I could have never interrupted you on Saturday night. . . but the way I have been feeling is that you don't have any interest in a relationship with me. And of course I do with you very much." "[M]y fear got the better of me and Saturday night happened." Westlake also admitted that he was obsessed with Huenefeld, but that he knew Huenefeld was not interested in a relationship.

30.     On Monday, February 11, 2008, Huenefeld told Westlake that she intended to take a week of vacation in May, which he approved. Westlake also discussed their relationship,

and told Huenefeld that what he did on the night of Saturday, February 2, 2008 was "perfect." He said, "At least Cindy blew herself apart. That's the good thing that came out of this for me."

31.     During another telephone conversation on February 11, Huenefeld told Westlake that she had traveled to New York City and Cabo San Lucas, Mexico with another man. Westlake responded, "I don't want you to do that. I want you to go to New York and Cabo with me."

32.     On Tuesday, February 12, 2008, Huenefeld told Westlake that she did not appreciate that he was constantly attempting to invade her personal life, including hiring private investigators to follow her. Westlake responded, "I'm going to find out what's happening whether you like it or not. I'm sorry. You don't like my methods? That's the only method that's available to me. And I'm going to do it. But I'm not going to do it anymore because it doesn't matter."

33.     On March 10, 2008, Huenefeld sent Westlake a letter to again tell him that she was not interested in a romantic relationship with him and that he needed to stop bringing up their former romantic relationship. Westlake responded via email, writing, "This is the first time you have told me directly that you no longer want a romantic involvement with me. I can accept that situation. Thanks for being candid so that I can move forward as you have."

34.     On March 12, 2008, Westlake called Huenefeld to tell her that he was denying her request for vacation in May. Huenefeld reminded him that he had already verbally approved her request, but he said, "It's not my problem, it's yours. Deal with it. If you go, you don't have a job." He later said that Huenefeld could not take the vacation in May because Arrowhead did not have an assistant manager to manage the property while Huenefeld was on vacation. But

Westlake resisted every attempt Huenefeld made to find a new assistant manager after Schlie was forced to quit.

35.     On Monday, May 12, 2008, Huenefeld visited Dr. Lundberg.  He again told Huenefeld that the stress she was enduring at work was not good for her heath and advised her to take two weeks off of work.  When Huenefeld told Westlake that she needed two weeks of medical leave, Westlake told her that if he found out that Huenefeld went on her planned vacation to Cabo San Lucas, Mexico with Spelder that she would be fired.  Westlake told Huenefeld that he would personally make sure she was in Cincinnati during the entire two weeks of her medical leave.

36.     On Thursday, May 15, 2008, Huenefeld resigned from Shelter Concepts.  She was no longer able to withstand the repeated harassment and poor treatment from Westlake.  No reasonable person could have endured Westlake's actions any longer, and they amounted to a constructive discharge.

37.     When Huenefeld informed Westlake of her need for medical leave, he appointed Laurie the acting manager of Arrowhead.  Upon Huenefeld's resignation, Laurie was made the manager.

## COUNT I

### (Sexual Harassment—Shelter Concepts—42 U.S.C. § 2000e)

38.     Huenefeld repeats the allegations in paragraphs 1 through 37 of the Complaint as if fully restated herein.

39.     Shelter Concepts, through the actions of Westlake, repeatedly sexually harassed Huenefeld as described above from the time she terminated their sexual relationship in April 2005 through her constructive discharge in May 2008.

40.     Westlake's harassment of Huenefeld was unwelcome and adversely affected the terms, conditions, and privileges of her employment. The harassment created a hostile work environment.

41.     As a result of Shelter Concepts' conduct, Huenefeld suffered extreme emotional distress and was unable to continue working as the property manager at Arrowhead.

42.     Shelter Concepts' conduct damaged Huenefeld in violation of 42 U.S.C. § 2000e.

## COUNT II

### (Sexual Harassment—Shelter Concepts—Ohio Rev. Code § 4112.02)

43.     Huenefeld repeats the allegations in paragraphs 1 through 42 of the Complaint as if fully restated herein.

44.     Shelter Concepts, through the actions of Westlake, repeatedly sexually harassed Huenefeld as described above from the time she terminated their sexual relationship in April 2005 through her constructive discharge in May 2008.

45.     Westlake's harassment of Huenefeld was unwelcome and adversely affected the terms, conditions, and privileges of her employment. The harassment created a hostile work environment.

46.     As a result of Shelter Concepts' conduct, Huenefeld suffered extreme emotional distress and was unable to continue working as the property manager at Arrowhead.

47.     Shelter Concepts' conduct damaged Huenefeld in violation of Ohio Rev. Code § 4112.02.

## COUNT III

### (Sexual Harassment—Westlake—Ohio Rev. Code § 4112.02)

48.     Huenefeld repeats the allegations in paragraphs 1 through 47 of the Complaint as if fully restated herein.

49.     Westlake was Huenefeld's supervisor.

50.     Westlake repeatedly sexually harassed Huenefeld, as described above, from the time she terminated their sexual relationship in April 2005 through her constructive discharge in May 2008.

51.     Westlake's harassment of Huenefeld was unwelcome and affected the terms, conditions, and privileges of her employment. The harassment created a hostile work environment.

52.     As a result of Westlake's illegal conduct, Huenefeld suffered extreme emotional distress and was unable to continue working as the property manager at Arrowhead.

53.     Huenefeld has been damaged by Westlake's conduct in violation of Ohio Rev. Code § 4112.02 and is entitled to judgment.

## COUNT IV

### (Intentional Infliction of Emotional Distress—Westlake—Ohio Law)

54.     Huenefeld repeats the allegations in paragraphs 1 through 53 of the Complaint as if fully rewritten herein.

- 12 -

55.     Westlake intentionally and recklessly caused Huenefeld to suffer extreme emotional distress through his repeated sexual harassment.

56.     Westlake's conduct was so outrageous in character as to go beyond all possible bounds of decency and is utterly intolerable in a civilized community.

57.     As a result of Westlake's intentional and reckless conduct, Huenefeld suffered extreme emotional distress and was unable to continue working at the Shelter Concepts. Huenefeld has been damaged by Westlake's conduct and is entitled to judgment.

## COUNT V

### (Intentional Infliction of Emotional Distress—Westlake—Georgia Law)

58.     Huenefeld repeats the allegations in paragraphs 1 through 57 of the Complaint as if fully rewritten herein.

59.     Westlake intentionally and recklessly caused Huenefeld to suffer extreme emotional distress through his repeated sexual harassment.

60.     Westlake's conduct was so outrageous in character as to go beyond all possible bounds of decency and is utterly intolerable in a civilized community.

61.     Huenefeld's severe emotional distress is causally connected to Westlake's harassment in Georgia.

62.     As a result of Westlake's intentional and reckless conduct, Huenefeld suffered severe emotional distress and was unable to continue working at the Shelter Concepts. Huenefeld has been damaged by Westlake's conduct in violation of Georgia law and is entitled to judgment.

**WHEREFORE,** Plaintiff Audra M. Huenefeld demands judgment on all claims against Defendants Shelter Concepts Management Corp. and Robert G. Westlake, jointly and severally, as follows:

1.     An award of lost wages, benefits, and expenses related to her loss of employment from the date of her resignation until the end of trial;

2.     An award of front pay from the end of trial until she is able to obtain employment with similar pay and opportunities;

3.     An award of compensatory damages against the defendants for all damages she has suffered as a result of their wrongful actions, in an amount to be proven at trial;

4.     An award of punitive damages and attorney fees;

5.     All other relief to which she may be entitled.

### JURY DEMAND

Plaintiff, by and through counsel, demands trial by jury of all issues within this action.

Respectfully submitted,

Robert A Klingler (0031603)
525 Vine Street, Suite 2320
Cincinnati, Ohio 45202-3133
Telephone: (513) 665-9500
Facsimile: (513) 621-3240
Trial Attorney for Plaintiff

OF COUNSEL:

ROBERT A. KLINGLER CO., L.P.A.
525 Vine Street, Suite 2320
Cincinnati, Ohio 45202-3133
Telephone:  (513) 665-9500
Facsimile:  (513) 621-3240